**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


LYNN GREYGOR,                     )
                                       )
             Plaintiff,         )
                                         )     Civil Action No. 14-1254
             v.                  )
                                         )
WEXFORD HEALTH SOURCES, INC.,  )     Judge Nora Barry Fischer
and BUTLER COUNTY,               )
                                         )
             Defendants.     )


## <u>MEMORANDUM OPINION</u>


### I.    INTRODUCTION

Presently before the Court are the respective motions for summary judgment (ECF Nos. 63 and 67) filed by Wexford Health Sources, Inc. ("Wexford"), and Butler County ("County") (*collectively*, "Defendants") on December 4, 2015, pursuant to Federal Rule of Civil Procedure 56(a). Defendants seek judgment as a matter of law with respect to all claims contained in the December 12, 2014 Amended Complaint (ECF No. 31) filed by Lynn Greygor ("Plaintiff"), administratrix of the estate of Derek T. Guidos ("Decedent"). Plaintiff's claims are asserted pursuant to 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution, as well as pursuant to Pennsylvania state law for alleged negligence. This Court exercises subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367(a) (supplemental). For the following reasons, Defendants' motions shall be DENIED.


### II.    PROCEDURAL AND FACTUAL BACKGROUND

## A. General Background

### 1. Butler County Prison

The Butler County Prison ("Prison"), located in downtown Butler, Pennsylvania, has an approved bed capacity of 564, and an average daily in-house population of 368 inmates as of August 2013. (ECF No. 70-25 at 5). There are 91 full-time and 20 part-time security staff members, 6 full-time administrative staff members, 5 full-time treatment staff members, and 13 full-time and 2 part-time support staff members. (ECF No. 70-25 at 5). Healthcare is administered by Wexford Health Sources, Inc. (ECF No. 70-25 at 9).

### 2. Regulatory Compliance and Prison Policy

The Pennsylvania Department of Corrections has set forth regulations governing the operation of county jails at 37 Pa. Code § 95.220 *et seq*. (ECF Nos. 69 at ¶ 89; 75 at ¶ 89). In 2011 and 2013, the Prison passed Department of Corrections inspections with no infractions of the code. (ECF Nos. 69 at ¶¶ 90, 92; 75 at ¶¶ 90, 92). There is no record for 2012; however, Department of Corrections correspondence in 2013 indicated that because the Prison passed inspection without infractions, it was exempt from review the following year. (ECF Nos. 69 at ¶ 90; 70-25 at 2; 75 at ¶ 90).

The Prison policy and procedure manual dictates that the Prison administrator must meet with the Prison health care provider on an annual basis, and that the healthcare provider must provide annual statistical reports on the health care delivery system and environment, as well as a written report demonstrating that adequate healthcare is being provided to inmates. (ECF No. 70-9 at 4). In addition, Prison correctional officers are to be trained to respond to health-related situations, including recognizing signs and symptoms of illness or emergency, and knowing how to appropriately respond. (ECF No. 70-9 at 6).

### 3. Inmate Orientation Booklet

An inmate orientation booklet is provided to inmates upon entrance to the facility. Its provisions regarding medical and psychiatric treatment indicate that "[a]ll necessary medical services will be provided." (ECF No. 85-2 at 15). It goes on to state that "[y]ou will be seen by a nurse or doctor on a schedule determined by the nature of your complaint, and scheduling needs." (ECF No. 85-2 at 15). The booklet also notes the availability of a medical grievance procedure, allowing inmates to file a grievance if there is a disagreement about his or her care. (ECF No. 85-2 at 16). A written response is to be provided, and if the inmate still disagrees with his or her medical treatment, he or she may appeal the decision to the Deputy Warden of Security. (ECF No. 85-2 at 16).

### 4. Wexford Health Sources, Inc.

Wexford is responsible for providing medical services at the Prison. (ECF Nos. 69 at ¶ 1; 75 at ¶ 1). A health services agreement was entered into by Wexford and the County on January 18, 2012, and took effect on February 1, 2012. (ECF Nos. 66 at 3; 69 at ¶¶ 1, 3; 75 at ¶¶ 1, 3). Wexford's October 12, 2011 Proposal and October 31, 2011 Best and Final Offer letter were incorporated into the agreement. (ECF No. 66 at 3). By the terms of the agreement, all costs of providing professional medical care are borne by Wexford. (ECF No. 66 at 3). Wexford is considered to be an independent contractor. (ECF No. 70-1 at 12). Both Wexford and the County agreed to indemnify one another against claims filed by a third party when said claims implicate only the contractual duties or responsibilities of either Wexford or the County. (ECF No. 70-1 at 11 – 12).

The agreement also provides a formula for staffing levels.[1]  (ECF No. 70-1 at 5).  The positions anticipated by the contract to be employed by Wexford at the Prison included that of Medical Director, Psychiatrist, Health Services Administrator, Certified Medical Technician, Psychiatric Nurse, and Licensed Practical Nurse.  (ECF No. 70-1 at 5).  Due to an increase in the Prison population, the agreement was amended in September, 2012, to add a Registered Nurse position and Licensed Practical Nurse position.  (ECF No. 70-1 at 20).  These positions could be filled with independent contractors, and Wexford had no responsibility to exercise control over the manner or means by which professional medical duties were performed.  (ECF No. 70-1 at 6).  However, Wexford would be required to "exercise administrative supervision over such professionals necessary to ensure the strict fulfillment of the obligations contained" in the agreement.  (ECF No. 70-1 at 6).  Wexford was also required to maintain accurate medical records for each inmate in accordance with applicable laws, County policy and procedure, and the standards of the National Commission on Correctional Health Care.  (ECF No. 70-1 at 7).

The position of Medical Director – which must be filled by a physician – was held by James Minshull, M.D. ("Dr. Minshull").  (ECF Nos. 69 at ¶ 5; 75 at ¶ 5).  The Medical Director is responsible for making and reviewing all medical and clinical decisions.  (ECF No. 73-2 at 38).  On January 25, 2012, Wexford contracted with Dr. Minshull "to provide medically necessary and authorized on-site primary care and oversight services for the physician assistant at the Butler County Prison."  (ECF No. 73-2 at 40).  It was further agreed that Dr. Minshull would "visit the site at least three times each month."  (ECF No. 73-2 at 40).  If Dr. Minshull determined that adequate care could not be provided to an inmate during an on-site visit, he was to contact Wexford to arrange for the inmate to be treated off-site.  (ECF No. 73-2 at 40).  Dr.

---

[1] The formula provides the numbers of hours expected to be clocked by each position on an annual basis.  (ECF No. 70-1 at 5).

4

Minshull was required to "clock-in" and "clock-out" as instructed by the Wexford Health Sources Administrator or on-site designee. (ECF No. 73-2 at 40). The contract does not specifically identify Dr. Minshull as the "Medical Director." Dr. Minshull was also an emergency room physician at Butler Memorial Hospital. (ECF Nos. 69 at ¶ 6; 75 at ¶ 6).

The position of Health Services Administrator was held by Rebecca Watterson, RN ("Nurse Watterson"). (ECF Nos. 69 at ¶ 4; 75 at ¶ 4). The Health Services Administrator is responsible for the overall operation of the Prison health care program. (ECF No. 73-2 at 38). Nurse Watterson was expected to work with Wexford corporate staff in administration of Prison health services, and work with the Medical Director in the management of clinical care. (ECF No. 73-2 at 50). To this end, Nurse Watterson would act as a liaison between Wexford and the Prison administration and staff, would supervise the pharmacy, medical records, nursing care, the laboratory, and x-rays, and develop and implement directives and procedures necessary to comply with the health services agreement and Prison administrative directives. (ECF No. 73-2 at 50). Staff members reporting to Nurse Watterson during the relevant time period included: Lawrence Sumansky, RN ("Nurse Sumansky"), Nancy Mohr, LPN ("Nurse Mohr"), and Nichole Shaffer, LPN ("Nurse Shaffer").

Wexford also employed a physician assistant[2] at the Prison, Jeff Houk ("PA Houk"). His purpose was to provide basic medical services under the supervision of a licensed physician. (ECF No. 73-2 at 49). In accordance with Wexford policy, he reported – administratively – to Nurse Watterson. (ECF No. 73-2 at 49). However, for all clinical matters, he reported to Dr. Minshull. (ECF No. 73-2 at 49). PA Houk's job description required him to document all health care contacts, identify inmate health problems and prescribe treatment under the direction of a

---

[2] There was no provision in the health services agreement for the employment of a physician assistant.

physician, and implement medical care utilizing therapeutic regimens approved by a physician. (ECF No. 73-2 at 49).

During the relevant time period, Wexford employees were available for on-site medical services from 6:00 a.m. until 11:00 p.m., daily, and by telephone from 11:00 p.m. until 6:00 a.m. (ECF Nos. 69 at ¶¶ 9, 11; 75 at ¶¶ 9, 11). When in need of medical attention, inmates were treated in the Prison's Medical Department. (ECF Nos. 69 at ¶ 15; 75 at ¶ 15). If an inmate required observation when no Wexford employees were on-site, the inmate could be transferred to Processing; Processing was staffed by correctional officers all day. (ECF Nos. 69 at ¶¶ 15 – 17; 75 at ¶¶ 15 – 17). If a Prison inmate required immediate medical attention when Wexford employees were not on-site, the inmate would be sent to a hospital. (ECF Nos. 69 at ¶ 12; 75 at ¶ 12).

     5.  <u>Wexford Policies, Procedures, and Protocols</u>

Wexford's "Operations Policies and Procedures" manual provides that an inmate is to receive a comprehensive health appraisal within fourteen days of admission into the Prison. (ECF No. 73-1 at 4). The appraisal is to include communicable disease and tuberculosis testing, recording of height, weight, blood pressure, and temperature, and a physical examination. (ECF No. 73-1 at 4). A registered nurse, physician assistant, nurse practitioner, or physician may perform the appraisal, but the registered nurse must have appropriate training approved by Wexford's medical director, and a physician must document that he or she reviewed the registered nurse's appraisal. (ECF No. 73-1 at 4). All laboratory tests are to be reviewed by a physician, and any diagnoses or treatment recommendations stemming from the results of the appraisal must be made by a physician. (ECF No. 73-1 at 4).

Wexford is also required to establish a health record for an inmate beginning with the initial health appraisal. For purposes of standardization of medical records, Wexford personnel are to use the Problem Oriented Medical Record ("POMR") method, and follow the Subject, Objective, Assessment, and Plan ("SOAP") format. (ECF No. 73-1 at 6). An inmate's health record is to be updated after each medical encounter, and signed by the treating source. (ECF No. 73-1 at 6).

Wexford maintains "Nursing Treatment Protocols" for its nursing personnel. There is a specific protocol for use in cases of nausea or vomiting by an inmate. The nurse is to document the inmate's temperature, pulse, respirations, blood pressure, bowel sounds, and tenderness/abdominal distension. (ECF No. 73-1 at 23). If the inmate complains of vomiting, he or she is to be observed for thirty minutes, and the nurse should note the color and consistency of any emesis. (ECF No. 73-1 at 23). A nurse should refer complaints of nausea and vomiting to a physician assistant, nurse practitioner, or physician if fever and abdominal pain accompany nausea and vomiting, if there is extreme pain, if emesis contains blood, or if symptoms persist for greater than twenty-four hours. (ECF No. 73-1 at 23). Nurses should treat complaints with clear liquids or Pepto-Bismol. (ECF No. 73-1 at 23). Nurses are to avoid the use of laxatives, antacids, or aspirin. (ECF No. 73-1 at 23).

There is also a specific protocol for complaints of stomach ache. The nurse is to document the inmate's temperature, pulse, respirations, blood pressure, color, pain, abdominal distension, and bowel sounds. (ECF No. 73-1 at 23). The nurse should refer complaints of stomach ache to a physician assistant, nurse practitioner, or physician if the inmate has pale, discolored, or clammy skin, severe localized or general pain, abnormal vital signs, bloody stool, black stool, vomiting, abdominal firmness, absent bowel sounds, or pain for greater than twenty-

four hours.  (ECF No. 73-1 at 23).  Nurses should treat complaints by advising inmates to eat properly and drink fluids, or use a warm or hot compress.  (ECF No. 73-1 at 23).  Maalox, Mylanta, or Milk of Magnesia may also be provided.  (ECF No. 73-1 at 23).

**B. Decedent's Chronological Record of Prison Health Care Services**

1. Initial Point of Contact

Decedent was 27 years of age when he first arrived at the Prison on October 8, 2012. (ECF Nos. 69 at ¶ 22; 75 at ¶ 22).  During the booking process, Decedent was observed to be intoxicated; however, he refused to give a breathalyzer reading.  (ECF No. 66 at 4).  Decedent was generally aggressive and uncooperative, made threatening comments to one of the booking officers, and had cuts on his legs and a mark on his face. (ECF No. 66 at 4, 6).  Decedent's crime involved providing alcohol to minors (ECF No. 66 at 5).  Decedent had previously been incarcerated in various correctional facilities on approximately five occasions.  (ECF No. 66 at 5).  Decedent was noted to have attention deficit hyperactivity disorder.  (ECF No. 66 at 5).  He also had a history of heroin use.  (ECF No. 66 at 6).

On October 9, 2012, Prison staff also completed a medical observation report.  (ECF No. 70-11).  Staff noted that Decedent had used marijuana a week prior to incarceration, and had imbibed alcohol on the day of his incarceration.  (ECF No. 70-11 at 2).  Decedent was oriented, had good affect, good speech, and good energy.  (ECF No. 70-11 at 2 – 3).  Decedent was not thought to require any specific medical intervention at that time.  (ECF No. 70-11 at 4).

2. Health Appraisal

On October 19, 2012, Nurse Mohr[3] completed a detailed health assessment of Decedent. (ECF Nos. 69 at ¶ 24; 75 at ¶ 24).  Nurse Mohr observed that Decedent was missing five teeth,

_____

[3] Nurse Mohr is only a Licensed Practical Nurse, and was not among the medical personnel permitted to perform the initial health appraisal.  (ECF No. 73-1 at 4).  *See* Wexford Policies, Procedures, and Protocols, *supra*, at 6.

although the general condition of his remaining teeth and gums was fair, and that Decedent's condition was otherwise unremarkable. (ECF No. 66 at 13). She also noted that he was 5' 7'' tall and weighed 148 pounds, and that his pulse was 66 and his blood pressure was 92/54. (ECF No. 66 at 13).

3. November 6, 2012:

Decedent's first medical complaint was recorded on November 6, 2012, at which point he claimed to be suffering from abdominal pain during a court hearing. (ECF Nos. 69 at ¶ 25; 75 at ¶ 25). Upon his return to the Prison, Decedent was evaluated by Nurse Mohr. (ECF Nos. 69 at ¶ 26; 75 at ¶ 26). Decedent vomited and complained of nausea. (ECF Nos. 69 at ¶ 26; 75 at ¶ 26). Nurse Mohr recorded hearing bowel sounds in all four quadrants of Decedent's abdomen. (ECF Nos. 69 at ¶ 26; 75 at ¶ 26). She recommended that he drink more fluids, and call for a medical evaluation if his symptoms did not improve. (ECF Nos. 69 at ¶ 26; 75 at ¶ 26).

At 3:30 p.m., a correctional officer contacted Nurse Mohr to inform her that Decedent had vomited blood. (ECF Nos. 69 at ¶ 27; 75 at ¶ 27). Nurse Mohr consulted with Nurse Watterson, and subsequently had Decedent transferred to the Medical Department at 4:10 p.m. (ECF Nos. 69 at ¶¶ 28 – 29; 75 at ¶¶ 28 – 29). At 5:00 p.m. Nurse Mohr examined Decedent, and again noted hearing bowel sounds in all four quadrants. (ECF Nos. 69 at ¶ 30; 75 at ¶ 30).

Later that evening, PA Houk examined Decedent. He noted that Decedent had vomited and could not keep anything down. (ECF Nos. 69 at ¶ 31; 75 at ¶ 31). The vomit was dark brown in color. (ECF Nos. 65 at ¶ 8; 73 at ¶ 8). PA Houk did not believe that he saw any indications of blood in the vomit. (ECF Nos. 65 at ¶ 11; 73 at ¶ 11). He also noted that Decedent's abdomen was tender mid epigastric with guarding. (ECF Nos. 65 at ¶ 10; 73 at ¶ 10). PA Houk ordered Zantac, Milk of Magnesia, and an x-ray of Decedent's abdomen. (ECF Nos.

65 at ¶ 10; 69 at ¶ 31; 73 at ¶ 10; 75 at ¶ 31).  Pepcid was given by Nurse Mohr in lieu of Zantac.  (ECF Nos. 65 at ¶ 12; 73 at ¶ 12).  At 10:28 p.m. Decedent was moved from the Medical Department to Processing.  (ECF Nos. 69 at ¶ 32; 75 at ¶ 32).

An examination of Wexford's progress notes for any record of treatment for Decedent reveals six notations for November 6.  (ECF No. 66 at 9).  The first five were signed by Nurse Mohr.  (ECF No. 66 at 9).  Only once did she record checking Decedent's vital signs and bowel sounds.  (ECF No. 66 at 9).  There is no indication that Dr. Minshull was informed that Decedent claimed to have vomited blood.  (ECF No. 66 at 9).  Decedent was provided with Tylenol.  (ECF No. 66 at 9).  The last progress note for November 6 was unsigned and stated only that Decedent had mid-epigastric tenderness with guarding and constipation.  (ECF No. 66 at 9).  Zantac was prescribed, and an x-ray was ordered.  (ECF No. 66 at 9).

4.  <u>November 7, 2012:</u>

At 9:15 a.m., Decedent was moved back to the Medical Department.  (ECF Nos. 69 at ¶ 33; 75 at ¶ 33).  That morning, correctional officers began completing a 'BAU check sheet' documenting the officers' observations of Decedent approximately every 15 minutes.  (ECF Nos. 69 at ¶¶ 34 – 35; 70-17 at 2 – 4; 75 at ¶¶ 34 – 35).  A nurse provided Decedent with Vistaril, Milk of Magnesia, and Zantac.  (ECF Nos. 65 at ¶ 13; 73 at ¶ 13).  Around 2:00 p.m., a single view of Decedent's abdomen was x-rayed.  (ECF Nos. 69 at ¶ 36; 75 at ¶ 36).  A physician interpreted the findings as "normal without evidence of bowel dilation or obstruction."  (ECF Nos. 69 at ¶ 36; 75 at ¶ 36).  At 9:55 p.m., Decedent returned to Processing.  (ECF Nos. 69 at ¶ 37; 75 at ¶ 37).  However, the BAU check sheet did not include entries after Decedent was moved to Processing.  (ECF Nos. 69 at ¶ 38; 75 at ¶ 38).

An examination of Wexford's progress notes for any record of treatment for Decedent reveals only one notation for November 7. (ECF No. 66 at 9). The notation was signed by Nurse Mohr, and indicated only that Decedent had been x-rayed and was awaiting the results. (ECF No. 66 at 9). No other information was provided.

5. November 8, 2012:

Decedent was relocated to the Medical Department at 8:50 a.m. (ECF Nos. 69 at ¶ 42; 75 at ¶ 42). Correctional officers resumed completion of BAU check sheets approximately every 15 minutes until 3:00 p.m., after which he was checked only every 30 minutes. (ECF No. 70-17 at 4 – 6). A nurse provided Decedent with Vistaril, Milk of Magnesia, and Zantac. (ECF Nos. 65 at ¶ 16; 73 at ¶ 16). At 1:00 p.m., Decedent vomited, and Nurse Mohr examined him and provided Milk of Magnesia. (ECF Nos. 69 at ¶ 43; 70-17 at 4; 75 at ¶ 43). At 2:45 p.m. and 3:30 p.m., nurses attended to Decedent and provided medication. (ECF Nos. 69 at ¶¶ 44 – 45; 75 at ¶¶ 44 – 45). Decedent received two more doses of milk of magnesia. (ECF Nos. 65 at ¶¶ 17 – 19; 73 at ¶¶ 17 – 19). At 9:40 p.m., Decedent informed Nurse Mohr that he wanted to go to the hospital. (ECF Nos. 69 at ¶ 46; 75 at ¶ 46). Nurse Mohr examined Decedent and heard bowel sounds in all four quadrants of his abdomen. (ECF Nos. 69 at ¶ 46; 75 at ¶ 46). Nurse Mohr assured Decedent that he would be assessed again in the morning, and provided him with more medication. (ECF Nos. 65 at ¶ 22; 69 at ¶ 46; 73 at ¶ 22; 75 at ¶ 46). Decedent was not moved from the Medical Department that night. (ECF Nos. 69 at ¶ 47; 75 at ¶ 47).

An examination of Wexford's progress notes for any record of treatment for Decedent reveals two notations for November 8. (ECF No. 66 at 10). The first note, signed by Nurse Mohr, stated that Decedent had been vomiting and had not moved his bowels. (ECF No. 66 at 10). Decedent was given a fourth dose of Milk of Magnesia and instructed to inform Nurse

Mohr as soon as he had a bowel movement. (ECF No. 66 at 10). Another licensed practical nurse whose signature is illegible made the next treatment note, and reported checking Decedent's bowel sounds. (ECF No. 66 at 10). She also noted that he had not had a bowel movement and wanted to go to the hospital. (ECF No. 66 at 10). This nurse stated that she would inform Dr. Minshull, and that Decedent would be assessed again in the morning. (ECF No. 66 at 10).

6. November 9, 2012:

Correctional officers continued completion of BAU check sheets approximately every 30 minutes until 6:15 a.m., after which he was checked every 15 minutes. (ECF No. 70-17 at 6 – 9). At 10:00 a.m., Decedent was given more medication. (ECF Nos. 69 at ¶ 49; 75 at ¶ 49). Nurse Watterson then spoke with Decedent, at which time he claimed that his abdominal pain had decreased, and that he had managed to push out a small amount of hard stool. (ECF Nos. 69 at ¶ 48; 75 at ¶ 48). At 12:00 p.m., Nurse Watterson consulted with Dr. Minshull regarding Decedent's condition, but received no new orders. (ECF No. 70-14 at 3). At 3:30 p.m., a correctional officer observed Decedent dry heaving into a toilet and Nurse Watterson consequently spoke with Decedent. (ECF Nos. 69 at ¶ 53; 70-17 at 8; 75 at ¶ 53). At 7:30 p.m., Decedent was seen again by a nurse. (ECF Nos. 69 at ¶ 54; 75 at ¶ 54). Decedent was offered medication, but declined to take it. (ECF Nos. 65 at ¶ 32; 73 at ¶ 32). At 11:00 p.m., Decedent was moved to Processing. (ECF Nos. 69 at ¶ 55; 75 at ¶ 55).

An examination of Wexford's progress notes for any record of treatment for Decedent reveals two notations for November 9.[4] (ECF No. 66 at 10). In the first notation, Nurse Watterson reported that Decedent had decreased stomach pain and nausea. (ECF No. 66 at 10). Decedent also pushed out a small amount of hard stool. (ECF No. 66 at 10). Nurse Watterson

[4] The second medical notation was made out of sequence with the remainder of the medical notes for the same day.

checked his vital signs, and noted that Decedent still complained of feeling constipated. (ECF No. 66 at 10). Nurse Watterson reported her observations to PA Houk. (ECF No. 66 at 10). In the second notation, Nurse Watterson reported that she spoke with Dr. Minshull about Decedent's complaints and symptoms, and that Dr. Minshull did not recommend any changes in Decedent's treatment regimen. (ECF No. 66 at 11). Nurse Watterson also noted that Decedent was retaining fluids without further vomiting, and that he admitted that he was a heroin addict.[5] (ECF No. 66 at 11).

7. November 10, 2012:

Correctional officers resumed completion of BAU check sheets approximately every 30 minutes until 10:00 a.m., after which he was checked every 15 minutes. (ECF No. 70-17 at 9 – 12). Decedent returned to the Medical Department at 10:15 a.m. (ECF Nos. 69 at ¶ 57; 75 at ¶ 57). Nurse Shaffer offered medication, but Decedent declined to take it. (ECF Nos. 65 at ¶ 33; 73 at ¶ 33). Decedent did not eat lunch. (ECF No. 70-17 at 11). At 12:15 p.m., a nurse checked Decedent. (ECF Nos. 69 at ¶ 58; 75 at ¶ 58). Decedent was provided with Citrate of Magnesia. (ECF Nos. 69 at ¶ 59; 75 at ¶ 59). Nurse Sumansky requested that Decedent or a correctional officer inform him if Decedent vomited again. (ECF Nos. 69 at ¶ 59; 75 at ¶ 59). At 4:30 p.m., Decedent informed a correctional officer that his abdominal pain was worsening. (ECF Nos. 69 at ¶ 61; 75 at ¶ 61). Decedent did not eat dinner. (ECF No. 70-17 at 12). At 5:00 p.m., a nurse attended to Decedent and offered Zantac, but Decedent declined to take it. (ECF Nos. 65 at ¶ 35; 69 at ¶ 62; 73 at ¶ 35; 75 at ¶ 62). Decedent was moved to Processing at 5:45 p.m. (ECF Nos. 69 at ¶ 63; 75 at ¶ 63). BAU check sheets were not completed after 5:45 p.m. (ECF No. 70-17 at 12).

---

[5] At the March 17, 2016 hearing before this Court regarding Defendants' motions for summary judgment, the parties acknowledged that constipation is a common side-effect of addiction to opioids.

An examination of Wexford's progress notes for any record of treatment for Decedent reveals only one notation for November 10.[6] (ECF No. 66 at 11). Nurse Sumansky noted therein that Decedent was provided with Citrate of Magnesia for ongoing complaints of constipation. (ECF No. 66 at 11). He asked Decedent to let him know when Decedent moved his bowels. (ECF No. 66 at 11). Decedent made no such report. (ECF No. 66 at 11). However, Nurse Sumansky did observe Decedent "up and about." (ECF No. 66 at 11).

8. November 11, 2012:

At 8:30 a.m., Decedent was taken to the Medical Department. (ECF Nos. 69 at ¶ 64; 75 at ¶ 64). Decedent was offered Zantac, but declined to take it. (ECF Nos. 65 at ¶ 37; 73 at ¶ 37). At this time, correctional officers resumed completion of BAU check sheets approximately every 30 minutes until 3:00 p.m., after which he was checked every 15 minutes. (ECF No. 70-17 at 13). Around 11:00 a.m., a correctional officer informed Nurse Sumansky that Decedent was complaining of pain. (ECF Nos. 69 at ¶ 65; 75 at ¶ 65). Decedent told Nurse Sumansky that he had vomited Citrate of Magnesia around 9:30 p.m. the evening before, and that he had reported it to the nurse on duty at the time.[7] (ECF Nos. 69 at ¶ 65; 75 at ¶ 65). At 11:30 a.m., a nurse checked in on Decedent. (ECF Nos. 69 at ¶ 67; 75 at ¶ 67). Around 2:00 p.m., another nurse informed Nurse Sumansky that Decedent had a small, soft bowel movement. (ECF Nos. 69 at ¶ 68; 75 at ¶ 68).

At 3:45 p.m., Decedent complained of pain to a correctional officer. (ECF Nos. 69 at ¶ 71; 70-17 at 13; 75 at ¶ 71). At 4:15 p.m., Decedent informed Nurse Shaffer that he was experiencing abdominal pain. (ECF Nos. 69 at ¶¶ 71 – 72; 75 at ¶¶ 71 – 72). Nurse Shaffer examined Decedent's abdomen for several minutes, but could hear almost no bowel sounds.

---

[6] This medical notation was made out of sequence on November 13, 2012, after Decedent's death.

[7] There is no notation in the medical record which reflects this statement by Decedent.

(ECF Nos. 69 at ¶ 73; 75 at ¶ 73). Due to the potentially serious implications of such symptoms, Nurse Shaffer believed that Decedent should be sent to a hospital. (ECF Nos. 69 at ¶ 73; 75 at ¶ 73). Upon consultation, Nurse Watterson agreed, and Decedent was transported to Butler Memorial Hospital at approximately 4:45 p.m. (ECF Nos. 69 at ¶¶ 74 – 75; 75 at ¶¶ 74 – 75).

An examination of Wexford's progress notes for any record of treatment for Decedent reveals two notations for November 11.[8] (ECF No. 66 at 10, 12). Nurse Sumansky reported that early in the morning, Decedent had vomited his Citrate of Magnesia. (ECF No. 66 at 12). Decedent had a small bowel movement, but did not move much stool. (ECF No. 66 at 12). Later that day, Nurse Shaffer reported that Decedent was complaining of increased abdominal pain and nausea. (ECF No. 66 at 10). Nurse Shaffer heard no bowel sounds upon examination, and recommended that Decedent be sent to the hospital. (ECF No. 66 at 10).

Records from Butler Memorial Hospital indicate that Decedent arrived at 5:26 p.m. (ECF Nos. 69 at ¶ 76; 75 at ¶ 76). At 6:33 p.m., an emergency department physician ordered a CT scan of Decedent's abdomen, and the scan was completed at 6:56 p.m. (ECF Nos. 69 at ¶¶ 77 – 78; 75 at ¶¶ 77 – 78). At 7:33 p.m., a physician interpreted the results of the CT scan to indicate the presence of a small bowel obstruction. (ECF Nos. 69 at ¶ 79; 75 at ¶ 79). Upon receipt of these results, the emergency room physician diagnosed Decedent with a small bowel obstruction at 8:38 p.m. (ECF Nos. 69 at ¶ 80; 75 at ¶ 80). At 8:55 p.m. an attending physician was assigned to Decedent's case, and at 9:13 p.m., another hospital physician reviewing the CT scan results agreed that a small bowel obstruction was present. (ECF Nos. 69 at ¶¶ 81 – 82; 75 at ¶¶ 81 – 82). Decedent was in acute distress due to the small bowel obstruction all evening. (ECF Nos. 69 at ¶ 83; 75 at ¶ 83).

9. November 12, 2012:

_____

[8] The second medical notation was made out of sequence on November 13, 2012, after Decedent's death.

Decedent remained in acute distress due to the small bowel obstruction, but was not seen by his attending physician until 4:00 p.m. (ECF Nos. 69 at ¶ 85; 75 at ¶ 85). At 6:03 p.m., Decedent was taken to the operating room for emergency surgery; however, Decedent's condition had progressed beyond treatment, and Decedent went into cardiac arrest and died while being anesthetized at 6:15 p.m. (ECF Nos. 69 at ¶¶ 86 – 87; 70-13 at 2; 75 at ¶ 86 – 87). An autopsy revealed that Decedent's cause of death was sepsis due to acute diffuse peritonitis,[9] secondary to rupture of twisted Meckel's diverticulum[10] and obstruction of the small bowel. (ECF Nos. 69 at ¶ 88; 70-23 at 2; 75 at ¶ 88).

### C. Miscellaneous Treatment Records

Wexford's progress notes show that over the course of his treatment while at the Prison, Decedent had received doses of Tylenol, Vistaril, Milk of Magnesia, Zantac, Pepcid, and Citrate of Magnesia to treat his complaints. (ECF No. 66 at 14). Wexford's record of Physician Orders regarding Decedent's course of treatment shows that PA Houk prescribed all of the above

---

[9] "Peritonitis is inflammation of the peritoneum – a silk-like membrane that lines your inner abdominal wall and covers the organs within your abdomen – that is usually due to a bacterial or fungal infection." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/peritonitis/basics/definition/con-20032165 (last visited May 9, 2016). "Peritonitis can result from any rupture (perforation) in your abdomen, or as a complication of other medical conditions." *Id.* "Peritonitis requires prompt medical attention to fight the infection and, if necessary, to treat any underlying medical conditions." *Id.* "Treatment of peritonitis usually involves antibiotics and, in some cases, surgery." *Id.* "Left untreated, peritonitis can lead to severe, potentially life-threatening infection throughout your body." *Id.*

[10] "Meckel's diverticulum is an outpouching or bulge in the lower part of the small intestine." Cleveland Clinic, http://my.clevelandclinic.org/childrens-hospital/health-info/diseases-conditions/hic-meckels-diverticulum (last visited May 9, 2016). "The bulge is congenital (present at birth) and is a leftover of the umbilical cord." *Id.* "Meckel's diverticulum is the most common congenital defect of the gastrointestinal tract." *Id.* "It occurs in about 2-3 percent of the general population." *Id.* "Symptoms of Meckel's diverticulum usually occur during the first year of a child's life, but can occur into adulthood." *Id.*
Symptoms include:
- Gastrointestinal bleeding (which can be seen in the stool).
- Abdominal pain and cramping.
- Tenderness near the navel (belly button).
- Obstruction of the bowels, a blockage that keeps the contents of the intestines from passing. This can cause pain, bloating, diarrhea, constipation, and vomiting.
- Diverticulitis (swelling of the intestine wall).
*Id.* "Bowel obstruction occurs more often in older children and adults." *Id.*

medications. (ECF No. 66 at 16). There is no indication that Dr. Minshull approved of, reviewed, or signed off on any of these orders. (ECF No. 66 at 16).

### D. Deposition Testimony

1. Nurse Watterson – Health Services Administrator

Nurse Watterson was a carry-over from the Prison's healthcare provider prior to Wexford, and held the same position there. (ECF No. 70-2 at 6). She testified that she could not recall the last time that she read Wexford's policy manual. (ECF No. 70-2 at 4). She noted that Dr. Minshull usually only visited the Prison once per month. (ECF No. 70-2 at 10). Sometimes Dr. Minshull would be present more often, and sometimes he would not be present at all. (ECF No. 70-2 at 10). Dr. Minshull did not sign in when he visited the Prison, and no formal record of his visitations exists. (ECF No. 70-2 at 10 – 11).

Nurse Watterson contacted Dr. Minshull on November 9 regarding Decedent's complaints – specifically, that he had claimed to vomit blood. (ECF No. 70-2 at 13 – 14). Dr. Minshull and Nurse Watterson believed that Decedent was merely constipated. (ECF No. 70-2 at 15). Nurse Watterson also believed that, based upon Decedent's symptoms and complaints, Decedent's health was improving. (ECF No. 70-2 at 12). She admitted that she never physically examined Decedent, and was unaware of whether Wexford policy required such an examination. (ECF No. 73-1 at 29). Nurse Watterson believes that there is nothing that Wexford personnel could have done differently to prevent Decedent's death. (ECF No. 73-1 at 31).

2. Dr. Minshull – Medical Director

Dr. Minshull testified that he only provided on-site care at the Prison in 2012 "several times." (ECF No. 73-1 at 46). He could not specify how many times. (ECF No. 73-1 at 46). He was not required to clock in or clock out. (ECF No. 73-1 at 48). Dr. Minshull indicated that he

also supervised PA Houk, and would routinely review PA Houk's treatment charts and make suggestions, when necessary. (ECF No. 73-1 at 46). He would review these charts "at least a couple times a month." (ECF No. 73-1 at 47). Dr. Minshull was purportedly unaware that his employment contract required that he be present at the Prison at least three times per month. (ECF No. 73-1 at 47). He admitted that he was not always on-site that frequently, but that he would "probably talk with the nurse every week." (ECF No. 73-1 at 47). He denied that he would not appear at all in a given month. (ECF No. 73-1 at 48).

Dr. Minshull recalled a telephone conversation with Nurse Watterson regarding Decedent, and was of the impression that Decedent's health was improving. (ECF No. 70-3 at 5, 7). However, he did not recall being informed that Decedent had potentially vomited blood, or that Decedent requested to go to the hospital. (ECF Nos. 70-3 at 6 – 7; 73-1 at 54).

### 3. Nicholas Alan Little – Vice President of Strategic Contracting and Compliance

Mr. Little was involved in the bidding process for the Prison's healthcare provider. (ECF No. 70-4 at 4). Mr. Little characterized the Prison as a small facility, and noted that similar sized facilities operated by Wexford do not have 24-hour staffing. (ECF No. 70-4 at 6). However, the Prison – like Wexford's other similar sized facilities – had access to 24-hour emergency care. (ECF No. 70-4 at 5 – 6).

### 4. Phillip M. Shaffer – Deputy Warden of Security and Mental Health

Mr. Shaffer testified that no medical staff was present at the Prison between 11:00 p.m. and 6:00 a.m. (ECF No. 70-5 at 3 – 4). Prison staff would observe inmates, and contact medical personnel, if necessary. (ECF No. 70-5 at 3 – 5). If there was a clear emergency, however, Prison staff would immediately send an inmate to the hospital. (ECF No. 70-5 at 4 – 5). As of the time of the deposition, Wexford implemented 24-hour staffing. (ECF No. 70-5 at 4).

Mr. Shaffer noted that when there was only one inmate in the Medical Department, they would often move the inmate to Processing for overnight observation so that they would not need to send an officer through the Medical Department every 30 minutes.  (ECF No. 70-5 at 6).  Processing is staffed by at least one officer, all day.  (ECF No. 70-5 at 9).  Decedent was kept in Cell No. 4 in Processing, which was unique because it was adjacent to where officers sat and was able to be constantly monitored.  (ECF No. 70-5 at 10).  If Wexford had objected to moving Decedent – or any inmate – from the Medical Department, the Prison would assign extra staff to patrol the Medical Department regularly during the night.  (ECF No. 70-5 at 7 – 8).

When an inmate is taken from the Medical Department to Processing, officers are to regularly document the inmate's condition on BAU check sheets.  (ECF No. 70-5 at 11, 14).  Gaps in Decedent's BAU check sheets were considered to possibly be the result of an officer's failure to remember to record his or her observations.  (ECF No. 70-5 at 14).  Mr. Shaffer believed it more likely that the gaps were an indication that Decedent's condition was unchanged.  (ECF No. 73-2 at 9).  Mr. Shaffer admitted, however, that without complete BAU check sheets no one could be sure what happened to Decedent during the missing hours.  (ECF No. 73-2 at 12).  Decedent's BAU check sheets were frequently notated at fifteen minute intervals, although it would typically have been at only thirty minute intervals.  (ECF No. 73-2 at 8).  Mr. Shaffer believes the shorter intervals were requested by Wexford personnel.  (ECF No. 73-2 at 8).  Mr. Shaffer was unaware of whether or not the Prison warden had met with Wexford representatives for an annual review.  (ECF No. 73-2 at 3).

5.  Neil Fisher, M.D. – Corporate Medical Director for Quality Management and Pharmacy

Dr. Fisher testified that Wexford policies are meant to "guide the site." (ECF No. 70-6 at 3, 5). Nurses may choose whether or not to utilize a Wexford protocol. (ECF No. 66 at 55 – 56). Dr. Fisher's testimony was equivocal when questioned about whether Wexford's policy requiring the Medical Director to make and review all medical and clinical decisions was reflective of Wexford's actual practices at the Prison. (ECF No. 70-6 at 4 – 5). Dr. Fisher stated only that the Medical Director and Health Services Administrator are meant to work as a team to resolve issues, but where there is a conflict, the Medical Director should – in theory – prevail. (ECF No. 70-6 at 5).

   6. Nurse Sumansky

Nurse Sumansky testified that when he made two out of sequence notes in Decedent's progress reports, he was unaware that Decedent had already died. (ECF No. 70-19 at 4). He made the late entries at the request of a "supervisor." (ECF No. 70-19 at 5). Nurse Sumansky claimed that he could not recall why he was asked to make the out of sequence notes, but that the he would not have made these notes in the normal course of treating an inmate. (ECF No. 70-19 at 6). Nurse Sumansky was not aware of any complaints made by Decedent that were not recorded in his treatment notes. (ECF No. 70-19 at 9). He also testified that he would not necessarily have recorded every time an inmate vomited. (ECF No. 70-19 at 10).

Nurse Sumansky was not aware of how many days Decedent had been complaining of constipation when he began treating him. (ECF No. 70-19 at 11). Nurse Sumansky believed that the constipation was beginning to resolve due to some initial small bowel movements and no observable acute distress. (ECF No. 70-19 at 11 – 13). Yet, Nurse Sumansky never saw any of the bowel movements. (ECF No. 70-19 at 12). Nurse Sumansky also acknowledged that a person with a bowel obstruction might still have bowel movements. (ECF No. 70-19 at 12).

7.  Nurse Shaffer (Allshouse)

Before recommending that Decedent be sent to the hospital, Nurse Shaffer listened to Decedent's bowel sounds – or lack thereof – for approximately three minutes.  (ECF No. 70-20 at 6).  She spent extra time listening, because she could not hear anything.  (ECF No. 70-20 at 6).  Nurse Shaffer also noted that Decedent's bowel was rigid.  (ECF No. 70-20 at 7).  Nurse Sumansky had been on duty at the same time.  (ECF No. 70-20 at 7).  He did not discuss Decedent's condition with Nurse Shaffer before she examined Decedent.  (ECF No. 70-20 at 7).  Nurse Shaffer and Nurse Watterson both agreed that Decedent required emergency medical attention, and Nurse Shaffer had no difficulty reaching Nurse Watterson to confer with her.  (ECF No. 70-20 at 9).  No Wexford personnel accompanied Decedent to the hospital.  (ECF No. 70-20 at 11).  Only a form detailing Decedent's condition was provided to the hospital.  (ECF No. 70-20 at 11).

8.  PA Houk

PA Houk testified that he observed Decedent's emesis on November 6 and noticed no indications of blood.  (ECF Nos. 66 at 22; 73-1 at 20).  He was informed that the results of the x-ray of Decedent's abdomen showed no evidence of obstruction.  (ECF No. 66 at 23).  PA Houk did not check Decedent's vital signs.  (ECF No. 73-1 at 21).  He believed Decedent was suffering only from gastritis.  (ECF No. 73-1 at 21).  He did not inform Dr. Minshull of Decedent's complaints.  (ECF Nos. 66 at 22; 73-1 at 22).  But, he asked Nurse Watterson to "run his case by" Dr. Minshull.  (ECF No. 73-1 at 22).

PA Houk admitted that he only had conversations with Dr. Minshull a "couple times a month," and had no idea whether or not Dr. Minshull reviewed his charts.  (ECF No. 73-1 at 19).  PA Houk acknowledged that Decedent's symptoms could be consistent with a small bowel

obstruction. (ECF No. 73-1 at 21). He did not order a standing x-ray in addition to a flat plate, because he had never done so before. (ECF No. 73-1 at 21). Additionally, it was not typical for PA Houk to discuss ordering x-rays with Dr. Minshull. (ECF No. 73-1 at 22).

9. Tony Maalouf, M.D.

Dr. Maalouf was the surgeon treating Decedent at the hospital. He testified that the symptoms of small bowel obstruction include abdominal pain, nausea, vomiting, constipation, bowel distension, firm abdomen, hyperactive and hypoactive bowel sounds, certain air-fluid levels, and specific radiological signs. (ECF No. 73-2 at 53 – 54). He further noted that if the obstruction is not complete, stool can still be passed. (ECF No. 73-2 at 53).

Dr. Maalouf opined that multiple types of scans are used to diagnose bowel obstruction. (ECF No. 73-2 at 54). For a standard x-ray, an anteroposterior and lateral view would be ordered. (ECF No. 73-2 at 54). CT scans would also aid by providing more detail and a more accurate picture of the presence of free air in the abdomen. (ECF No. 73-2 at 54).

**E. Expert Reviews**

1. Review by Steven R. Wanamaker, M.D.

On October 8, 2015, following a review of all the medical records generated during treatment of Decedent's complaints of abdominal pain, constipation, nausea, and vomiting, Dr. Wanamaker concluded that it was clear that Decedent suffered from a "reversible and treatable surgical emergency." (ECF No. 66 at 46). The delay in treatment upon Decedent's arrival at the hospital resulted in sepsis and death. (ECF No. 66 at 46). An initial CT scan clearly established the presence of a bowel obstruction requiring immediate attention. (ECF No. 66 at 46). Communication failures between hospital physicians, including Dr. Minshull, resulted in Decedent's avoidable death. (ECF No. 66 at 46).

2. Review by Michael R. Greenberg, M.D.

On October 20, 2015, following a review of all the medical records generated during treatment of Decedent's complaints of abdominal pain, constipation, nausea, and vomiting, Dr. Greenberg concluded that a series of clinical errors by both Wexford and the hospital resulted in Decedent's avoidable death. (ECF No. 73-1 at 9 – 15). Dr. Greenberg opined that Wexford personnel's inadequate treatment over six days amounted to indifference, and that Wexford personnel failed to thoroughly record Decedent's treatment history, failed to conduct adequate physical examinations, failed to order appropriate diagnostic studies, failed to properly interpret Decedent's symptoms, failed to appropriately treat Decedent's symptoms, failed to timely send Decedent to a medical facility, and failed to follow the Pennsylvania Board of Medicine's rules and regulations for the supervision of physician assistants. (ECF No. 73-1 at 13 – 14). Dr. Greenberg concluded that the dark brown emesis observed by PA Houk was, in fact, an indication of blood. (ECF No. 73-1 at 10). X-ray and CT scan results at the hospital clearly indicated the presence of a small bowel obstruction. (ECF No. 73-1 at 12). Overall, both Wexford and the hospital were considered to have failed to adequately respond to Decedent's condition. (ECF No. 73-1 at 9 – 15).

**F. Procedural History**

Plaintiff filed a Complaint in this Court on September 19, 2014. (ECF No. 1). An Amended Complaint was filed on December 12, 2014, alleging at Counts I – IV that Defendants were liable for Decedent's death as a result of negligence, as defined under Pennsylvania state law, and as a result of the failure to provide adequate healthcare, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (ECF No. 31). On December 4, 2015, Defendants filed Motions for Summary Judgment with respect to Plaintiff's federal

constitutional claim at Count IV of the Amended Complaint. (ECF Nos. 63 and 67). Having been fully briefed (ECF Nos. 64 – 66, 68 – 70, 73 – 76, 79 – 82, and 84 – 85), the Court held a March 17, 2016 hearing on the matter.[11] Defendants' motions are now ripe for disposition.

## III. STANDARD OF REVIEW

A grant of summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko*

---

[11] No party requested a transcript of the hearing.

*v. Quaker Oats Co.*, 434 F.App'x 139, 141 n. 4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## V.    DISCUSSION

Plaintiff's Count IV claims are advanced pursuant to 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

Section 1983 serves as a means of vindicating violations of federal constitutional and statutory rights. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). In order to properly state a valid § 1983 claim, a plaintiff must demonstrate that an individual acting under color of law violated enumerated constitutional or statutory rights. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000).

At Count IV of Plaintiff's Amended Complaint, it is claimed that Defendants violated Decedent's right to adequate healthcare under the Eighth and Fourteenth Amendments. This alleged violation was the result of Defendants' failure to adhere to their respective policies

delineating the standard of care for ill inmates, as well as the contract between Defendants dictating the terms by which Wexford would provide healthcare to prison inmates. (ECF No. 31 at 10 – 15). Plaintiff claims that the failure of Wexford personnel to properly diagnose and treat Decedent's small bowel obstruction contributed to Decedent's death, and was the direct result of Wexford's failure to enforce adherence to Wexford policy. Plaintiff also claims that the County's failure to properly monitor Wexford's level of inmate care and adherence to the health services agreement directly contributed to Decedent's death. Plaintiff argues that these failures constituted deliberate indifference. (ECF Nos. 74 at 2 – 19; 76 at 2 – 12; 84 at 1 – 6; 85 at 1 – 3).

Wexford counters that over the course of six days, its personnel had 25 medical contacts with Decedent with respect to his complaints of stomach ache, constipation, nausea, and vomiting. (ECF Nos. 64 at 7 – 19; 79 at 7 – 16). These medical contacts included diagnostic imaging tests, administration of medication, and physical examinations. (*Id.*). Wexford believes that there is no evidence that Decedent was denied adequate medical treatment, as required by the Eighth and Fourteenth Amendments. The County echoes this argument, but goes further by arguing that it did not influence the quality of care – or lack thereof – provided by Wexford, and had no reason to believe that Decedent was being neglected or treated inappropriately. (ECF Nos. 68 at 5 – 17; 82 at 1 – 8).

As an initial matter, the Court notes that the Eighth Amendment "proscribes more than physically barbarous punishments," but also the failure to provide adequate care to a prisoner "who cannot by reason of the deprivation of his liberty, care for himself." *Estelle v. Gamble*, 429 U.S. 97, 102 – 04 (1976) (citations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (Prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care."). To state

an Eighth Amendment claim for failure to provide adequate medical care, a claimant must establish two elements: (1) that the claimant was suffering from a serious medical need, and (2) that prison staff and/or medical personnel were deliberately indifferent to this need. *Miskovitch v. Hostoffer*, 721 F.Supp.2d 389, 399 (W.D. Pa. 2010).

With respect to the first element, a medical need may be considered "serious" when: (1) it "'has been diagnosed by a physician as requiring treatment';" (2) it "'is so obvious that a lay person would easily recognize the necessity for a doctor's attention';" or (3) "'the unnecessary and wanton infliction of pain' results from the denial or delay of adequate medical care." *Mori v. Allegheny Cnty.*, 51 F.Supp.3d 558, 566 – 67 (W.D. Pa. 2014) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 734 F.2d 326, 347 (3d Cir. 1987); *Estelle*, 429 U.S. at 103). While Defendants attempt to downplay[12] the seriousness of Decedent's complaints, the Court notes that the record – viewed in the light most favorable to Plaintiff – demonstrates that Decedent did not merely complain of mild constipation, nausea, and pain, but that he vomited blood and experienced abdominal pain so severe that he requested to go to the hospital. (ECF Nos. 69 at ¶¶ 27, 46; 73-1 at 10; 75 at ¶¶ 27, 46). Additionally, his complaints and related symptoms were not sporadic, but spanned six days, with minimal evidence of abatement.[13] As such, for purposes of defeating summary judgment, the Court finds that Plaintiff has demonstrated that Decedent's medical need was serious, and that it could be readily apparent to a layperson – e.g. a juror – that Decedent required the attention of a physician.

---

[12] "Wexford does not concede that constipation is a serious medical need." (ECF No. 79 at 9). Nevertheless, as the Court noted in oral argument, heroin addicts often exhibit constipation. Given the heroin epidemic currently being experienced in western Pennsylvania, in this Court's estimation both the County jail personnel and Wexford – which directs its services to prisoners – should be attuned to this problem.

[13] *See* FACTUAL AND PROCEDURAL BACKGROUND, *supra* at 8 – 15.

With respect to the second element of Plaintiff's Eighth Amendment claim, the Court notes that deliberate indifference is a well-established, "'subjective standard of liability consistent with recklessness as that term is defined in criminal law,'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000)), and comprises both "obduracy and wantonness." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Whitely v. Albers*, 475 U.S. 312, 319 (1986)). It "lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Mori*, 51 F.Supp.3d at 567 (quoting *Farmer*, 511 U.S. at 836). Deliberate indifference requires a claimant to provide proof that a defendant knew about, and consciously disregarded, excessive risks to the health and safety of inmates. *Natale*, 318 F.3d at 582 (citing *Farmer*, 511 U.S. at 837). More precisely, a defendant must be "'both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and draw the inference.'" *Id*. "'Acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs' constitute cruel and unusual punishment under the Constitution." *Williams v. Guard Bryant Fields*, 535 F.App'x. 205, 210 (3d Cir. 2013) (quoting *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987)).

The Third Circuit Court of Appeals has held that the existence of deliberate indifference may be shown in a variety of ways, including: (1) "knowing of and disregarding an excessive risk to inmate safety," (2) "necessary medical treatment being delayed for non-medical reasons," and (3) "arbitrary and burdensome procedures that 'result in interminable delays and outright denials of medical care to suffering inmates.'" *Sylvester v. City of Newark*, 120 F.App'x 419, 423 – 24 (3d Cir. 2005) (quoting *Farmer*, 511 U.S. at 837; *Lanzaro*, 734 F.2d at 347). Evidence

of negligence or medical malpractice by medical personnel is not sufficient to illustrate conduct "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105 – 6.

As the parties to the present action have all pointed out, Plaintiff may not simply rely upon the conduct of Wexford and County personnel to demonstrate deliberate indifference. Pursuant to the Supreme Court's holding in *Monell v. Dep't of Soc. Serv. of N.Y.C.*, 436 U.S. 658 (1978), liability for Defendants cannot be predicated on a theory of *respondeat superior* or vicarious liability. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). "A 'person' is not the 'moving force behind the constitutional violation' of a subordinate, unless that 'person' – whether a natural one or a municipality – has exhibited deliberate indifference to the plight of the person deprived." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). In order to demonstrate municipal liability for a constitutional violation under § 1983, a claimant must identify a municipal policy[14] or custom[15] that caused the constitutional violation. *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997)); *Guard Bryant Fields*, 535 F.App'x at 210 – 11. *See also Miller v. Corr. Med. Sys., Inc.*, 802 F.Supp. 1126, 1132 (D. Del. 1992) (This principle applies to private enterprises offering services on behalf of the municipality.).

Courts have identified three fact patterns whereby the acts of municipal personnel may be imputed to a policy or custom of a municipal entity, rendering the municipal entity liable under § 1983: (1) "where 'the appropriate officer or entity promulgates a generally applicable statement

---

[14] "A policy is made 'when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy, or edict.'" *Natale*, 318 F.3d at 584 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).

[15] "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" *Natale*, 318 F.3d at 584 (quoting *Bryan Cnty.*, 520 U.S. at 404). A custom may be shown with evidence of "knowledge and acquiescence." *Mori*, 51 F.Supp.3d at 569 (quoting *Fletcher v. O'Donnell*, 867 F.2d 791, 793 – 94 (3d Cir. 1989)).

of policy and the subsequent act complained of is simply an implementation of that policy;'" (2) "where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;'" and (3) "where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Natale*, 318 F.3d at 584 (quoting *Bryan Cnty.*, 520 U.S. at 417 – 18). The inquiry does not end there, however; a claimant must also establish that the municipal policy or custom was the proximate cause of his or her injuries. *Kneipp*, 95 F.3d at 1213. A claimant "must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's policy or custom and the specific deprivation of constitutional rights at issue." *Id.* As long as the link is not too tenuous, the jury should be left to decide whether the municipal entity's policy or custom caused the alleged constitutional violation. *Id.*

To this end, Plaintiff first turns her attention to the position of Medical Director, established in the health services agreement between Wexford and the County. (ECF No. 74 at 14 – 15). Dr. Minshull held this position throughout the relevant time period. According to the health services agreement, the position of Medical Director was to be staffed 156 hours per year. (*Id.* at 14 n. 3). This breaks down to 3 hours of work per week. (*Id.* at 14 – 15). Dr. Minshull's contract of employment further designates that Dr. Minshull is to be present at the Prison at least 3 times per month. (*Id.*). The deposition testimony from both Dr. Minshull and Nurse Watterson, viewed in the light most favorable to Plaintiff, casts significant doubt upon whether Dr. Minshull ever approached meeting these time requirements. (ECF Nos. 70-2 at 10 – 11; 73-1

at 46 – 47). During the 6 day period that Decedent was treated in the Prison Medical Department, he was never seen once by Dr. Minshull.

Further, Dr. Minshull's contract of employment with Wexford required him to monitor PA Houk. (ECF No. 74 at 15 – 17). Setting aside the fact that a physician assistant position was never explicitly contemplated by the health services agreement, or its later amendment increasing staff levels, PA Houk never saw or spoke with Dr. Minshull during the 6 day period that Decedent was in the Medical Department. (ECF No. 74 at 15 – 17). There is no evidence that Dr. Minshull reviewed PA Houk's work, as was required by his contract of employment and Wexford policy; this includes the ordering of a diagnostic x-ray that was apparently not adequate to rule out a bowel obstruction. (ECF No. 74 at 15 – 17). Further, PA Houk ordered all of Decedent's medication. (ECF No. 66 at 14, 16). Hence, there is no indication that Dr. Minshull had any input with respect to Decedent's treatment regimen. (ECF No. 74 at 15 – 17).

Dr. Minshull's contract of employment specified that he was to sign in and out of work every day when he was present at the Prison, at the direction of the Health Services Administrator – Nurse Watterson. Dr. Minshull never logged his work hours; he testified that he was unaware of such a requirement. (ECF No. 73-1 at 48). Nurse Watterson did not require him to do so. (ECF No. 70-2 at 10 – 11). Indeed, Wexford had no way of monitoring Dr. Minshull outside of his invoices which, themselves, did not describe the work he completed with any specificity. (ECF No. 73-2 at 45 – 47).

These facts of record, viewed in the light most favorable to Plaintiff, illustrate a total lack of adherence to Wexford policy by Dr. Minshull. It also clearly indicates that Wexford took no action to ensure that its own policies were being enforced – even the minimal requirement to sign in and out of work. While Wexford abdicated any responsibility to exercise control over how

Dr. Minshull's professional medical duties were performed, Wexford did have an explicit duty to "exercise administrative supervision over such professionals necessary to ensure the strict fulfillment of the obligations contained" in the health services agreement. (ECF No. 70-1 at 6).

It is true that arguing that Dr. Minshull should have "done more, or done it differently, or done it better…is *not* deliberate indifference." *Sylvester*, 120 F.App'x at 424 (emphasis added) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 760 (3d Cir. 1979)). "'Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Green v. Coleman*, 575 F.App'x 44, 47 (3d Cir. 2014) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). However, Plaintiff is actually arguing that Wexford's abject lack of oversight of Dr. Minshull created a situation in which an inmate with a serious medical need was unable to obtain treatment from a physician for 6 days. When Decedent was finally transported to a hospital, diagnostic imaging tests as ordered and reviewed by physicians there immediately contradicted the findings of the inadequate x-ray study ordered by PA Houk. (ECF Nos. 69 at ¶¶ 77 – 82; 75 at ¶¶ 77 – 82). Moreover, the treatments prescribed by PA Houk – without the review of Dr. Minshull – were all ineffective for the resolution of Decedent's actual medical issues.

The Court, therefore, finds that when viewed in the light most favorable to Plaintiff, the facts of record clearly demonstrate that the need to make sure that Dr. Minshull was actually performing his job duties as prescribed – and consequently, PA Houk's job duties – is so obvious, and the attendant risk of not doing so is so clear, that Wexford's reckless failure to monitor adherence may reasonably be said to exhibit deliberate indifference to a practice likely to result in the deprivation of constitutional rights. *Natale*, 318 F.3d at 584. *See also Andrews v.*

*Camden Cnty.*, 95 F.Supp.2d 217, 229 (D. N.J. 2000) ("[A] negative theory may…be pursued, in which the plaintiff is allowed to identify a policy or practice that was nominally in place, but…ignored.").  Wexford's Motion for Summary Judgment will be denied.

Plaintiff next turns her attention to the County's failure to monitor adherence by Wexford personnel to Wexford policy and the health services agreement, as well as the County's decision not to staff the Prison with medical personnel 24 hours per day.  (ECF No. 76 at 2 – 12).  With respect to Wexford's failure to properly monitor and ensure that the Prison was staffed with a physician, there is no indication in the record that the County took any steps to determine whether the terms of its delegation of health care services to Wexford were being followed.  The County points out that there is a requirement for annual appraisals of health care services provided by Wexford, and that the Decedent's case arose well before the first annual report would have been due.  (ECF No. 68 at 3).  This fact notwithstanding, it is still the County's responsibility to ensure an adequate level of care for inmates at all times.  *Andrews*, 95 F.Supp.2d at 228 ("When contracting for prison health services, a county or municipality still remains liable for constitutional deprivations caused by the policies or customs of the health service.").  A reasonable jury could determine that the County's failure to establish a policy to monitor Wexford's performance throughout the year could constitute deliberate indifference to the serious medical needs of inmates, specifically, the Decedent.  *Natale*, 318 F.3d at 584 – 85.  The facts of record, viewed in the light most favorable to Plaintiff, indicate that the County disregarded a known or obvious consequence to such minimal review of Wexford's operations – that a sick inmate may never receive adequate medical/physician care.

A similar conclusion could be reached regarding the County's staffing requirements.  The County acquiesced to Wexford's practice of not staffing the Prison Medical Department at night.

(ECF Nos. 69 at ¶¶ 9, 11; 75 at ¶¶ 9, 11). The duty to monitor inmates with health care needs fell to the non-medical Prison staff. The County also allowed for an inmate to be removed from the Medical Department to Processing to avoid the need for extra staffing. These facts, viewed in the light most favorable to Plaintiff, clearly evidence a non-medical/financial incentive behind these decisions by the County. As shown by the significant gaps in BAU checksheet data regarding Decedent's condition during his nights in Processing, the Prison lacks an enforced policy regarding the practices of Prison personnel monitoring sick inmates. All of these decisions deprive the Court of any insight into Decedent's condition while in Processing, whether he was in distress, or whether he wanted medical attention. Decedent may have obtained better care had he been monitored consistently in the evenings. As it stands, he may have received only sporadic – if any – observation by non-medical Prison personnel during his nights in Processing. A jury could reasonably determine that the County "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Natale*, 318 F.3d at 584. Therefore, the Court will deny the County's Motion for Summary Judgment.

## VI. CONCLUSION

Based upon the foregoing, a reasonable juror could conclude that the policies and customs of both Wexford and the County created a situation in which the risks to Decedent's serious medical needs were sufficiently obvious as to constitute deliberate indifference. Accordingly, Defendant Wexford Health Resources, Inc.'s Motion for Summary Judgment (ECF

No. 63) is denied, and Defendant Butler County's Motion for Summary Judgment (ECF No. 67)

is denied.

An Appropriate Order follows.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: May 17, 2016.
cc/ecf: All counsel of record.